

# NUMBER 13-08-296-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

STEVEN PEREZ,                                                      Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

---

On appeal from the 117th District Court
of Nueces County, Texas.

---

# MEMORANDUM OPINION

Before Justices Rodriguez, Garza, and Vela
Memorandum Opinion by Justice Vela

Appellant, Steven Perez, was indicted for the offense of murder.[1] *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2003). Following a jury trial, appellant was convicted, and the jury assessed punishment at sixty years' imprisonment and a $10,000 fine. In five issues, appellant argues that: (1) the trial court erred by denying his request to disqualify a juror; (2) the trial court erred by permitting the State to impeach its own witness; (3) the trial court improperly admitted into evidence appellant's video taped statement; (4) the trial court improperly denied appellant's proposed jury charge instruction on independent impulse; and (5) the evidence was legally and factually insufficient to support his conviction. We affirm.

## I. FACTUAL BACKGROUND

*A. State's Evidence*

Iris Perez and appellant were married in 2001 and divorced in 2005. At some point after their divorce, Iris began dating Riko Rodriguez. On one occasion, appellant had called Iris on her cell phone while she and Riko were together. Iris testified that Riko answered her cell phone and told appellant, "Something like quit calling, you're a bitch, or something like that, you've always been, you'll always be." The next day, Riko and Iris were in apartment 1107 at the Windrush Apartments in Corpus Christi, where Riko was staying with a friend, Roy De Los Santos, Jr. While Iris was visiting Riko in the apartment,

---

[1]The indictment alleged the offense of murder in two paragraphs as follows:

STEVEN PEREZ, defendant, on or about DECEMBER 2, 2006, in Nueces County, Texas, did then and there intentionally and knowingly cause the death of an individual, RIKO RODRIGUEZ, by shooting with a firearm[.]

STEVEN PEREZ, defendant, on or about DECEMBER 2, 2006, in Nueces County, Texas, did then and there with the intent to cause serious bodily injury to an individual, RIKO RODRIGUEZ, do the act of shooting him with a firearm; that this act was clearly dangerous to human life; and that this act caused the death of RIKO RODRIGUEZ.

Riko told her that he "was just fighting with Steve [appellant]." At that point, Iris's friend, Angela Lopez, came to the apartment to pick up Iris. As Iris was getting into Lopez's car, Iris saw that Riko and appellant were "fighting, hitting each other" in the parking lot. Two days later, on the morning of December 2, 2006, while Riko and Iris were sleeping in Roy's apartment, they awoke to someone kicking the front door. Iris looked out the window and saw Mike Lozano in front of the door and appellant running away. Iris testified that Lozano had his arm outstretched, but she did not see him holding a gun. Iris got on the floor, and Riko tried to cover her. At this point, four shots were fired through the front door. Riko was shot twice–once in the mid-chest and then once in the right thigh. The medical examiner described the chest wound as a "fatal type injury" and said that the bullet went through Riko's heart and liver.

Iris testified that after the shooting, appellant told her he did not do the shooting and that he was trying to leave. On cross-examination, Iris testified that appellant told her that he had fought Riko because Riko had called him a "bitch." She also testified that she did not think that appellant would try to kill Riko because of her, and she did not believe that appellant went to Roy's apartment in order to kill Riko. She said that before any shots were fired, appellant was already running away.

Roy testified that in the early morning of December 2, 2006, he was asleep in his bedroom when he woke up to the sound of "a kick" at the front door. After hearing three shots, he went into the living room where Riko told him, "[T]hey shot me, bro, they shot me."

On cross-examination, Roy stated that Riko never said who had shot him. However, Roy testified that prior to the shooting, Riko told him, "Steve said he was gonna come back

3

and get him." Roy did not know whether Riko meant appellant.

Benny Asberry, who lived in apartment 1105 at the Windrush Apartments, testified that on the Thursday before Riko's murder, a man "kept pacing back and forth in front of my window and he was yelling out" to a girl in apartment 1107. At some point, Riko came outside of the apartment and had three fights with this man. After the first fight, Asberry heard the man tell Riko, "'I'll fucking kill you.'" Early in the morning of December 2, 2006, Asberry heard a "real loud" knock and heard someone next door say, "[W]ho is it." After hearing that, Asberry heard several shots. He testified that upon hearing the first shot, he looked out his window and saw "a guy wearing a red—either red or maroon shirt and he was running off" and that "[I]t was the same guy he got into the fight with." He did not see who fired the shots.

Detective Ralph Lee testified that on January 18, 2007, he obtained a video-taped statement from appellant. In this statement, appellant stated he wanted to go to the apartment to see if Iris was there; however, the only way he could get Lozano to go with him was to tell him they were going there for a robbery. Appellant, his cousin David, and Lozano obtained a gun from someone and used appellant's car to go to the apartment. Lozano and appellant kicked the front door of the apartment, and appellant then said, "Forget this. Let's go." As appellant was leaving, Lozano fired four shots through the front door. While running from the scene, Lozano lost a shoe, which belonged to appellant. Afterwards, they returned the gun to the person who provided it to them. Appellant denied that he was the shooter. He also denied hearing someone say, "[W]ho is it" after he and Lozano had kicked the front door.

4

Riko's father, Ricardo Rodriguez, testified that before his son's murder, Riko, Lozano, and appellant had joined a local boxing club. Rodriguez testified that after Lozano joined the club, Lozano "built up some anger, some animosity towards" Riko. This animosity continued up to the time of Riko's murder. Rodriguez was not personally aware of any antagonism between appellant and Riko.

Crime-scene investigators testified that four shots came through the front door of apartment 1107 and that a man's size-ten shoe was found outside the apartment. A partial DNA profile obtained from this shoe was consistent with a mixture from appellant and at least two unknown individuals.

*B. Appellant's Evidence*

Angela Lopez knew appellant through her friend, Iris. Lopez testified that she went to the Windrush Apartments to pick up Iris, who was visiting Riko. As Lopez, Iris, and Riko left the apartment, appellant "was walking up." Lopez saw "a scuffle, like wrestling" between Riko and appellant. Iris and David, tried to separate them. After the scuffle, Riko and appellant "went [their] way." Lopez did not hear appellant make any threats to kill Riko.

Two days after Riko's murder, attorney Kenneth Botary accompanied appellant to the Corpus Christi Police Department where appellant told the police he was not the shooter. Botary testified that appellant "knew that he was the target of the investigation because he had a motive and he was the only one that had a motive for this thing." When defense counsel asked Botary if he recalled what that motive was, he replied:

> An estranged relationship with his wife, but Steve [appellant] basically told
> me it wasn't really that. He went to see his wife. They had been separated
> on and off. He knew that she was seeing Riko and others, and that didn't

5

bother him too much, but I think he went to see his wife on this occasion and Riko interfered with that relationship, and I think that's what really started the problem.

After Botary's testimony, defense counsel played a videotape to the jury, showing an interview between Detective Lee and Eric Flores. During this interview, Flores told Detective Lee that he had been incarcerated with Lozano. During that time, Lozano told Flores that he and "Steve" went to the apartment where Riko was staying "to rough that dude Riko up." Lozano and "Steve" went to the door of the apartment, and Lozano shot through the door. Afterwards, Lozano and Steve ran from the apartment, and Lozano lost his shoe, which belonged to Steve.

## II. DISCUSSION

### A. Request To Disqualify Juror

In issue one, appellant argues the trial court erred in denying his request to disqualify a juror because she did not disclose during voir-dire examination that she was a friend of the victim's sister. During voir-dire examination, the prosecutor asked the venire members if anybody either knew of or had heard about "the Riko Rodriguez family? There's Ricardo Rodriguez, Richard Rodriguez, the patriarch now, and his son, Riko Rodriguez who was killed, and then there's the grandson who is Ricky Rodriguez and they are involved in the Golden Gloves Boxing Club. Is anybody familiar with that family?" Venire member Christina Caldera did not respond affirmatively to this question. The prosecutor did not ask whether anyone knew Riko's sister, Ruby Carillo, and did not mention Carillo's name.

At a recess during the guilt-innocence phase, Caldera, outside the jury's presence, told the trial court she knew Carillo. The trial court asked Caldera whether she could

6

continue to serve as a juror.[2]  Afterwards, defense counsel asked[3] Caldera about her

[2]The trial court questioned juror Caldera as follows:

Q.    All right.  The fact that you know the sister of the victim, is that going to influence you in any way in this case?

A.    No.

Q.    Do you know her well?

A.    I see her when—I've seen her—we work together and we've had leadership program and I see her once a month.

Q.    She's in the leadership Corpus Christi program with you.

A.    She's employed in the same job I am.

Q.    So you are in leadership Corpus Christi.  Okay.  Did you know anything about this event the death of her [sic]?

A.    I didn't know anything.  I just know her brother passed away.

Q.    You did not know any of the facts of [sic] before you came into this case?

A.    No.

Q.    I'm going to allow—all we're looking for is fair and impartial, no preconceived ideas so if you have any bias or [sic] one side or the other I need to know that.

A.    No, I don't.

[3]Defense counsel questioned juror Caldera as follows:

Q.    When we did the jury selection yesterday and we asked all the people if they knew the victim or the victim's family, did you understand that question?

        * * * *

A.    Yes, I did but I didn't know that was her brother.

Q.    Okay.  So when the name of Riko Rodriguez was discussed, you didn't know that your co-worker was the sister of the—

A.    No, I did not.

Q.    Okay.  You didn't put that connection together?

A.    No.

Q.    So now you've seen his sister in the courtroom today, have you?

A.    Yes.

7

Q. And not only are you a friend of hers but you're her co-worker?

A. Correct.

Q. Is she a boss?

A. No.

Q. Does she supervise you?

A. No. Just working.

Q. Co-workers?

A. We work in totally different offices.

Q. You have a friendly relationship with her?

A. Uh-huh, yes, ma'am.

Q. Okay. I don't know if she heard.

A. She's my friend, yes.

Q. Now, do you think that the fact that one of the jurors is a friend of the victim's sister might be something that a person accused of killing that individual might have an issue with you being on the jury that decides his guilt or innocence?

A. Maybe so.

* * * *

The Court: The question is now that everybody you've made the connection, okay? Can you be a fair [sic].

Juror Caldera: Yes, I can be a fair juror.

The Court: You can listen to the evidence and arrive at a verdict regardless of that friendship?

Juror Caldera: Right and I believe that because I don't know what took place. I just know that she's my friend and I heard her brother had passed away. That's the bottom line. I didn't know any facts. I didn't see it on TV other than hearsay.

The Court: All right. And one final question, when you say she's your friend, have you socialized with her?

Juror Caldera: We socialize once a month and that's last 12 months because we are in a leadership program and that's the only way that we would—

The Court: In other words, you socialize at the leadership program?

8

relationship with Carillo. When defense counsel finished, he asked the trial court to excuse Caldera as a juror and to proceed with the alternate juror. The trial court denied the request, stating, "I'm going to find that she is suitable. She has stated on the record she can be fair and impartial. . . ."

Appellant argues that the trial court's denial of his request to excuse Caldera from the jury and to proceed with an alternate juror violated his rights under the United States and Texas Constitutions.

---

Juror Caldera:        Yes.

    * * * *

Defense Counsel:       What is the name?

Juror Caldera:        Her name is Ruby Carillo.

Q.      Ruby Carillo?

A.      Rudy Carillo.

The Court:           That's the name of the sister.

Defense Counsel:      You could see where she would have not have made a connection?

Q.      Do you think there would be any kind of an impact on her friendship with you if you were to find Mr. Perez not guilty in this case?

A.      I don't believe so.

Q.      And are you aware that there's an alternate juror—

A.      Yes.

Q.      Who was also selected in case something came up?

A.      Yes.

Q.      In your opinion, do you think it might be better to proceed with the alternate?

At this point, the trial court sustained the prosecutor's objection to the question, and defense counsel announced that he had no further questions.

1. *Applicable Law*

An accused in a criminal prosecution has the right to a fair trial by an impartial jury. U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10; *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004). Hence, "[w]hen a juror withholds material information in the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." *Armstrong v. State*, 897 S.W.2d 361, 363 (Tex. Crim. App. 1995) (citing *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978)). However, defense counsel has an obligation to ask questions that are calculated to elicit information which might be said to indicate a juror's inability to be impartial and truthful. *Id*. at 363-64 (citing *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980), *overruled on other grounds by Sneed v. State*, 670 S.W.2d 262, 267 n.7 (Tex. Crim. App. 1984)). "Unless defense counsel asks such questions, the material information which a juror fails to disclose is not really 'withheld.'" *Id*. at 364. Counsel's questions must be specific, not broad. *Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999); *Armstrong*, 897 S.W.2d at 363-64 (holding no error when counsel did not ask questions that would reveal juror's close friendship with prosecutor). The court of criminal appeals has "consistently held there is no error where counsel has not met that obligation." *Gonzales*, 3 S.W.3d at 917; *Armstrong*, 897 S.W.2d at 363-64; *Brandon v. State*, 599 S.W.2d 567, 577 (Tex. Crim. App. 1979) (holding no error when counsel failed to ask follow-up questions after potential juror stated he was acquainted with victim).

2. *Analysis*

In this case, Caldera testified outside the jury's presence that during voir-dire examination, she did not know that Carillo was Riko's sister. She did not realize that Carillo

10

was Riko's sister until she saw Carillo in the courtroom. During general voir dire, defense counsel did not ask the venire members whether any of them knew Riko's sister, Ruby Carillo. Thus, defense counsel did not ask the questions needed to elicit the desired information.[4] Appellant has not demonstrated that Caldera "withheld" information as contemplated by Texas case law because defense counsel did not ask questions during voir dire that were calculated to reveal impartiality regarding whether the venire members knew Riko's sister. *See Gonzales*, 3 S.W.3d at 917-18. Because defense counsel did not ask specific questions to bring out information that may indicate a juror's impartiality, Caldera did not withhold information that would constitute misconduct warranting a reversal. *See id.* Therefore, the trial court did not err in refusing to disqualify Caldera. Issue one is overruled.

## B. State's Impeachment of Iris Perez

In his second issue, appellant argues the trial court erred in allowing the State to improperly impeach its own witness, Iris Perez. During the guilt-innocence phase, Iris testified on direct-examination that she remembered what she had told Detective Lee during her telephone conversation with him.[5] However, when the prosecutor asked her if,

---

[4]We recognize that defense counsel is entitled to rely on the questions asked by the trial court and the prosecutor. *Armstrong v. State*, 897 S.W.2d 361, 364 n.1 (Tex. Crim. App. 1995). However, neither the trial court nor the prosecutor asked the venire members the necessary question, i.e., whether anyone knew the victim's sister. *See id*.

[5]This testimony appeared in the following colloquy between Iris and the prosecutor:

Q. Okay. When you started talking to Steven [appellant] again, how was that?

A. I was mad at him. And he was telling me he didn't do it. I was like blaming him.

Q. So you did blame him?

A. I mean, I—yeah.

11

during this telephone conversation, she had told Detective Lee "that the whole thing was [appellant's] fault?", she replied, "I don't think I said that." When the prosecutor asked the

---

Q. Okay. Did you think he should go to prison?

A. I don't really—maybe at that time I did. I don't know.

Q. When you talked to the detective again and told him what you saw, did you think Steve should go to prison at that time?

A. I didn't feel that Steve murdered Riko and I felt that Steve, from my understanding, he didn't mean for none of that to happen.

Q. So it's your testimony today that you did not blame Steve, that it wasn't Steve's fault that the whole thing happened?

A. Not really.

Q. Okay. Would it help you refresh your recollection if you heard the telephone call between you and Detective Lee?

A. No. I remember what I told him. I remember our conversation.

* * * *

Q. Okay. So did you or did you not tell him that the whole thing was Steve's fault?

A. I don't think I said that.

* * * *

Q. Would it help or would it not help refresh your recollection to hear the audio recording of that phone call?

A. No. I don't really want to hear anything.

Q. [D]o you think the recording would be a better example of the phone call or would your recollection today be a better example of the phone call?

A. I—I don't think I said that at all. I mean, I think I was telling him more of that it was Mike. I remember that.

Q. And Steve should go to prison, right?

A. I don't know.

Q. You don't know?

A. I think maybe I said if he should go, I don't think he should go for as long as Mike or something, like along those lines. I don't know. I don't remember.

12

trial court to allow her to publish the audiotape of this telephone conversation, defense counsel objected as follows:

> I believe that what the prosecutor wants to do is covered by Rule 613 and what needs to happen is the witness needs to have an opportunity to review the previous statement and then ask whether or not now the witness recalls making that statement or not, so if the prosecutor—.

At this point, the trial court overruled the objection and admitted the audiotape into evidence. The prosecutor played the tape to the jury. We interpret appellant's issue as a challenge that the prosecutor did not lay the proper predicate to impeach Iris with a prior inconsistent statement.

1. *Standard of Review*

We review the trial court's ruling regarding the admissibility of evidence under an abuse of discretion standard. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). "In other words, as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld." *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).

2. *Applicable Law*

"Impeachment of a witness means adducing proof that such witness is unworthy of belief or credit." *Willingham v. State*, 897 S.W.2d 351, 358 (Tex. Crim. App. 1995). Rule 607 states that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." TEX. R. EVID. 607. A prior inconsistent statement may be admitted under rule 613. *See* TEX. R. EVID. 613(a); *In re A.B.*, 133 S.W.3d 869, 874 (Tex. App.–Dallas 2004, no pet.). However, under the Texas Rules of Evidence, the use of extrinsic evidence of a prior inconsistent statement "is contingent upon the witness's

13

response when confronted with the alleged inconsistent statement." *Clark v. State*, 881 S.W.2d 682, 695 n.11 (Tex. Crim. App. 1994); TEX. R. EVID. 613(a) (stating that extrinsic evidence of an inconsistent statement is not admissible if the witness unequivocally admits having made the statement). Under former rule of criminal evidence 612(a), which was identical to the present rule 613(a),[6] the court of criminal appeals stated the predicate to the admission of the inconsistent statement:

> The proper predicate for impeachment by prior inconsistent statement requires that the witness first be asked if he made the contradictory statement at a certain place and time, and to a certain person. If the witness denies making the contradictory statement, it can then be proved by the prior inconsistent statement. If the witness admits the prior inconsistent statement, however, the prior statement is not admissible.

*McGary v. State*, 750 S.W.2d 782, 786 (Tex. Crim. App. 1988) (internal citations omitted) (internal quotation marks omitted).

Here, even though the prosecutor did not specifically ask Iris if she had made the contradictory statement at a certain place and time, when asked if she would like to hear the telephone call between her and Detective Lee, she testified that she remembered what she had told him during her telephone conversation with him.[7] And, crucially, she denied

---

[6]Current rule of evidence 613(a) states, in pertinent part, that:

In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted. . . .

TEX. R. EVID. 613(a).

[7]Specifically, the prosecutor asked Iris Perez the following:

Q.    Okay. Would it help you refresh your recollection if you heard the telephone call

14

having made the statement. Moreover, a review of the record reveals that Iris equivocated about making the prior inconsistent statement to Detective Lee. Thus, the State laid the proper predicate in accordance with rule 613(a), for impeachment by extrinsic evidence. *See* TEX. R. EVID. 613(a); *McGary*, 750 S.W.2d at 786. Accordingly, we conclude the trial court did not abuse its discretion by admitting the audiotape into evidence.

3. *Inadmissible Testimony*

By this same issue, appellant argues the prosecutor elicited inadmissible testimony from Iris. During Iris's direct-examination at the guilt-innocence phase, the prosecutor asked Iris on three occasions whether she thought appellant should go to prison. Defense counsel neither objected to these questions nor to Iris's responses to them. Appellant argues that whether Iris thought he should go to prison "was an inadmissible area" and that the purpose for the questioning "was to put before the jury an out of court statement that Iris believed [appellant] should go to prison."

"To preserve error, a complaining party must make a timely and specific request, objection, or motion and obtain an express or implied ruling on that request, objection, or motion." *Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008) (citing *Gauder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003)). Further, "an objection must be made each time inadmissible evidence is offered unless the complaining party obtains a running objection or obtains a ruling on his complaint in a hearing outside the presence of the jury."

---

between you and Detective Lee?

A.    No. I remember what I told him. I remember our conversation.

Q.    Do you remember it?

A.    Uh-huh.

15

*Id.* Here, an objection was not made to the complained-of questions, and counsel did not request a running objection nor did he obtain a ruling on his complaint in a hearing outside the jury's presence. Consequently, appellant has failed to preserve this argument for review. *See id.*

4. *Whether the Audio Tape Contained Inadmissible Evidence*

By this same issue, appellant argues the audio tape contained inadmissible evidence. Although counsel initially objected to the audio tape on the basis the State did not lay a proper predicate, he did not object that the tape contained inadmissible evidence. Counsel did not request a running objection and did not obtain a ruling on his complaint in a hearing outside the jury's presence. Further, counsel did not object, either before the audio tape was played to the jury or during the playing of the audio tape, that it contained inadmissible evidence. We conclude that appellant did not preserve this argument for our review. *See Lopez,* 253 S.W.3d at 684. Issue two is overruled.

C. *Admission of Appellant's Statement*

In his third issue, appellant argues the trial court erred by admitting into evidence the statement which he gave after his arrest. On January 18, 2007, appellant gave the police a video taped statement. Defense counsel filed a pre-trial motion to suppress the statement, and after a pre-trial hearing, the trial court denied the motion. These actions alone would have preserved the suppression issue for review without further objection by appellant during the trial. At trial, however, when the State offered the video taped statement into evidence, defense counsel stated, "I don't think I have an objection, Your Honor." The trial court admitted the video taped statement into evidence, and it was played before the jury.

16

The court of criminal appeals has held in similar situations that the suppression issue was not preserved for review. *See Swain v. State*, 181 S.W.3d 359, 368 (Tex. Crim. App. 2005) (stating that when State offered exhibits into evidence during trial, and appellant affirmatively stated he had no objection, the affirmative acceptance of this previously challenged evidence waived any error in its admission); *see also Moody v. State*, 827 S.W.2d 875, 889 (Tex. Crim. App. 1992); *Dean v. State*, 749 S.W.2d 80, 82-83 (Tex. Crim. App. 1988); *Harris v. State*, 656 S.W.2d 481, 484 (Tex. Crim. App. 1983); *McGrew v. State*, 523 S.W.2d 679, 680-81 (Tex. Crim. App. 1975). When evidence is offered during trial and defense counsel affirmatively represents that he has "no objection" to the evidence, any error in the admission of the evidence is waived even if the error had been previously preserved by a suppression motion and adverse ruling. *Moody*, 827 S.W.2d at 889; *Dean*, 749 S.W.2d at 82-83; *Harris*, 656 S.W.2d at 484; *McGrew*, 523 S.W.2d at 680-81. Because counsel affirmatively stated that he had no objection to the introduction of the statement, we hold that the complaint is not preserved with respect to the admission of that evidence. Issue three is overruled.

D. *Omitted Jury Instruction*

In his fourth issue, appellant argues the trial court erred in refusing to charge the jury on the defensive theory of independent impulse. At the conclusion of the trial, defense counsel asked the trial court to instruct the jury on the defensive theory of independent impulse. The trial court denied the requested instruction.

In addressing this issue, we first determine whether there was error in the charge. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g). If so, "the next step is to make an evidentiary review . . . as well as a review of any other part of the

record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *Id*.

1. *Applicable Law*

The concept of "independent impulse" embraces the theory that an accused, though he or she was admittedly intent on some wrongful conduct, nevertheless did not contemplate the extent of criminal conduct actually engaged in by his or her "fellows, and thus cannot be held vicariously responsible for their conduct." *Mayfield v. State*, 716 S.W.2d 509, 513 (Tex. Crim. App. 1986), *overruled by Solomon v. State*, 49 S.W.3d 356 (Tex. Crim. App. 2001). However, the court of criminal appeals has held that defendants are not entitled to instructions on defensive theories not enumerated in the Texas Penal Code, such as a defensive charge on independent impulse. *Walters v. State*, 247 S.W.3d 204, 210 (Tex. Crim. App. 2007); *Solomon,* 49 S.W.3d at 368. An instruction on independent impulse is merely a negation of elements in the State's case; therefore, its inclusion would be superfluous and, in fact, would be an impermissible comment on the weight of the evidence. *See Solomon*, 49 S.W.3d at 368.

2. *Analysis*

In *Solomon*, the court of criminal appeals held that a defendant charged with conspiracy liability under section 7.02(b) of the Texas Penal Code was not entitled to an independent-impulse instruction if the charge tracked the language of section 7.02(b). *Solomon*, 49 S.W.3d at 368. Here, appellant was not charged with conspiracy liability under section 7.02(b), but the trial court gave instructions tracking the statutory language of Texas Penal Code sections 7.01(a) and 7.02(a)(2). Both of these sections relate to the law of parties. Appellant's proposed defensive issue would simply negate the law of parties

18

element of the State's case and is inconsistent with current Texas law. *See Solomon*, 49 S.W.3d at 368. Because the jury charge tracked the language of sections 7.01(a) and 7.02(a)(2) and because the defense of independent impulse is not found in the penal code, we hold that the trial court did not err by refusing to include the instruction. *See Walters,* 247 S.W.3d at 210; *Solomon*, 49 S.W.3d at 368.[8] The fourth issue is overruled.

E. *Sufficiency of the Evidence*

In his fifth issue, appellant challenges the legal and factual sufficiency of the evidence to support his conviction. In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor

---

[8]*See also Zaragoza v. State*, No. 04-01-00499-CR, 2002 WL 1840927 at *5 (Tex. App.–San Antonio Aug. 14, 2002, no pet.) (not designated for publication) (appellate court held trial court did not err in denying defendant's request for independent-impulse instruction when defendant charged as a party under sections 7.01(a) and 7.02(a)(2)).

19

of the judgment.  *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In reviewing a factual sufficiency claim, we review the evidence in a neutral light rather than the light most favorable to the verdict.  *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)).  Evidence is factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust.  *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)).  We do not reverse for factual insufficiency if the greater weight and preponderance of the evidence actually favors conviction.  *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson*, 204 S.W.3d at 417).

1. *Murder and the Law of Parties*

A person commits murder if he or she "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual[.]"  TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2003).  Intent can be inferred from the defendant's acts, words, and conduct.  *Patrick v. State,* 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Lee v. State,* 964 S.W.2d 3, 8 (Tex. App.–Houston [1st Dist.] 1997, pet. ref'd).

Appellant argues the evidence is both legally and factually insufficient to support the verdict "because there was no proof [appellant] knew of Lozano's intent to murder [Riko] or helped him in that regard."  However, under the law of parties, as stated in the jury

20

charge, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003); *Frank v. State*, 183 S.W.3d 63, 72 (Tex. App.–Fort Worth 2005, pet ref'd). "A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2); *Frank,* 183 S.W.3d at 72. "Each party to an offense may be charged with commission of the offense." TEX. PENAL CODE ANN. § 7.01(b) (Vernon 2003). "Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1995). In determining whether a defendant participated in an offense as a party, the fact finder may examine the events occurring before, during, and after the offense's commission and may rely on the defendant's actions that show an understanding and common design to commit the offense. *Id.*

While the presence of the defendant at the scene of an offense is not alone sufficient to support a conviction, it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the defendant was a participant. *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987). Further, participation in an enterprise may be inferred from circumstances and need not be shown by direct evidence. *Id*. at 684.

21

2. *Analysis*

A rational jury could have determined the following from the evidence: Riko was seeing appellant's ex-wife, Iris, and when appellant called Iris's cell phone, Riko called him a "bitch." Shortly after Riko called appellant "a bitch," they fought each other. Two days later, Riko and Iris were at Roy's apartment. That morning, Roy's neighbor, Asberry, heard a "real loud" knock followed by someone saying, "[W]ho is it." Asberry then heard several shots. Moments before Riko was shot, Iris saw Lozano in front of the apartment door and appellant running away. After the shooting, Detective Lee obtained a video-taped statement from appellant in which appellant stated he wanted to go to the apartment to see if Iris was there; however, the only way he could get Lozano to go with him was to tell him they were going there for a robbery. Appellant, his cousin David, and Lozano got a gun from someone and then used appellant's car to go to the apartment. Lozano and appellant kicked the front door to Roy's apartment, and then appellant said, "Forget this. Let's go." As appellant was leaving, Lozano fired four shots through the front door. They fled the scene, and Lozano lost a shoe, which belonged to appellant. Afterwards, they returned the gun to the person who provided it to them. A partial DNA profile obtained from the shoe that came off of Lozano's foot was consistent with a mixture from appellant and at least two unknown individuals. While Lozano was in the county jail, he told Flores that he and "Steve" went to the apartment where Riko was staying "to rough that dude Riko up."

The controverting evidence showed that: (1) no one saw who fired the shots through the front door; (2) Iris did not hear Riko say "[W]ho is it" in response to the knock at the front door; (3) after the shooting, appellant told Iris he did not do the shooting and that he was trying to leave; (4) Riko never told Roy who had shot him; (5) in his statement

22

to Defective Lee, appellant denied having anything to do with the shooting; (6) appellant did not hear anyone say "[W]ho is it" after he and Lozano kicked the front door: (7) Riko's father was not personally aware of any antagonism between appellant and Riko; (8) Angela Lopez did not hear appellant make any threats to kill Riko; (9) appellant told the police he was not the shooter; and (10) Lozano told Flores that Lozano, not appellant, shot through the door.

Viewing all the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty of Riko's murder as a party to the crime beyond a reasonable doubt. Furthermore, viewing the evidence neutrally, we conclude the evidence is not so obviously weak that the verdict seems "clearly wrong and manifestly unjust" or that proof of guilt is against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15, 417; *Johnson*, 23 S.W.3d at 11. Accordingly, we hold the evidence is legally and factually sufficient to support appellant's conviction. Issue five is overruled.

### III. Conclusion

We affirm the trial court's judgment.


ROSE VELA
Justice


Do not publish.
Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and
filed this 26th day of February, 2009.